IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BYRON EUGENE JOHNSON,

          Petitioner,                  No. 2:04-cv–0253 LKK KJN P

    vs.

D.L. RUNNELS, et al.,

          Respondents.         FINDINGS AND RECOMMENDATIONS

_____/

I.  Introduction

        Petitioner is a state prisoner proceeding without counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2001 conviction for corporal injury on a cohabitant with an enhancement for inflicting great bodily injury on the victim.  Pursuant to the Three Strikes Law, petitioner is serving a sentence of twenty-five years to life.

        This action is proceeding on the amended petition filed October 3, 2005.  (Dkt. No. 14).  The amended petition raises the following claims: 1) ineffective assistance of counsel; 2) prosecutorial misconduct; 3) ineffective assistance of appellate counsel; 4) sentencing error.  Petitioner also raises a claim alleging that the prosecutor committed misconduct by removing an African-American juror.  Petitioner inadvertently left this claim out of the amended petition, but

1  it has now been fully briefed.  (Dkt. Nos. 57, 62.)

2          After carefully considering the record, the undersigned recommends that the

3  petition be denied.

4  II.  Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

5          In Williams (Terry) v. Taylor, 529 U.S. 362 (2000), the Supreme Court defined

6  the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254.

7  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the

8  court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the

9  Supreme Court, and an "unreasonable application of" that law.  Id. at 405.  "Contrary to" clearly

10  established law applies to two situations:  (1) where the state court legal conclusion is opposite

11  that of the Supreme Court on a point of law; or (2) if the state court case is materially

12  indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is

13  opposite.

14          "Unreasonable application" of established law, on the other hand, applies to

15  mixed questions of law and fact, that is the application of law to fact where there are no factually

16  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

17  Id. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid

18  to state court decisions.  While the deference is not blindly automatic, "the most important point

19  is that an unreasonable application of federal law is different from an incorrect application of

20  law....[A] federal habeas court may not issue the writ simply because that court concludes in its

21  independent judgment that the relevant state-court decision applied clearly established federal

22  law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 410-

23  11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

24  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

25  authority.  Woodford v. Viscotti, 537 U.S. 19 (2002).

26          "Clearly established" law is law that has been "squarely addressed" by the United

2

1   States Supreme Court. Wright v. Van Patten, 552 U.S. 120 (2008). Thus, extrapolations of

2   settled law to unique situations will not qualify as clearly established. See e.g., Carey v.

3   Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to

4   inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

5   unnecessary showing of uniformed guards does not qualify as clearly established law when

6   spectators' conduct is the alleged cause of bias injection).

7           The state courts need not have cited to federal authority, or even have indicated

8   awareness of federal authority, in arriving at their decision. Early v. Packer, 537 U.S. 3 (2002).

9   Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an

10   unreasonable application of, established Supreme Court authority. Id. An unreasonable error is

11   one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v.

12   Andrade, 538 U.S. 63, 75-76 (2003). Moreover, the established Supreme Court authority

13   reviewed must be a pronouncement on constitutional principles, or other controlling federal law,

14   as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v.

15   Packer, 537 U.S. at 9.

16           However, where the state courts have not addressed the constitutional issue in

17   dispute in any reasoned opinion, the federal court will independently review the record in

18   adjudication of that issue. "Independent review of the record is not de novo review of the

19   constitutional issue, but rather, the only method by which we can determine whether a silent state

20   court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

21   2003).

22           When reviewing a state court's summary denial of a claim, the court "looks

23   through" the summary disposition to the last reasoned decision. Shackleford v. Hubbard, 234

24   F.3d 1072, 1079 n. 2 (9th Cir. 2000).

25   III. Background

26           Respondent's answer contains a factual summary. After independently reviewing

3

the record, the undersigned finds this summary to be accurate and adopts it herein.

On June 30, 2001, victim Sonya Bennett lived in a residence at 3317 10th Avenue, Sacramento with petitioner, who was her boyfriend, and her roommate, Alvin Mayo. (RT at 338-40.)

At 3:38 p.m., a 911 call was received from the victim's residence.  The caller, who identified herself as the victim's sister, "Roberta," told 911 that the victim's boyfriend, "Eugene," had hit the victim in the head with a bottle.  The caller indicated that the person who had "assaulted" the victim had left.  (Id., at 409).[1]

Sacramento Police Officer Justin Johnson arrived at the residence and found the victim on the ground bleeding. The victim told him that "nothing" had happened and yelled at other people in the residence not to talk to the police.  (Id., at 410-11.)  Officer Johnson observed blood and glass in a back bedroom.  Based on the size and smell it was giving off, Officer Johnson believed the glass came from a forty ounce beer bottle.  (Id., at 416-17.)  A crime scene investigator observed glass shards on the floor of the bedroom and thought that one piece looked like it could be the bottom of a bottle.  (Id., at 310-11, 319-20.)

Sacramento Police Officer Michelle Beattie arrived between 4:00 and 4:15 p.m. and observed that there "was blood all over the hallways, the walls, one of the back bedrooms, into the bathroom, broken glass on the bedroom floor."  (Id., at 329-31.)

Mayo, the victim's roommate, initially told the police that he had not seen the incident and did not know what happened.  (Id., at 123.)  However, when the police returned later that evening, Mayo told them that he had awakened to a lot of mayhem and the sound of a

---

[1] The 911 tape, along with a number of tape recordings of petitioner's jailhouse telephone conversations, were played for the jury.  Copies of the tape recordings (People's Exhibits 1, 2, 3, 6, 8 and 9) were admitted in evidence at trial.  (Id., at 463-64.)  The recordings were included in the direct appeal and are included in documents lodged with this court.  For unknown reasons, respondent's copy of one of the recordings, Exhibit 8, is blank.  An additional recording, Exhibit 4, was admitted in evidence.  (Id.)  However, respondent found no reference to Exhibit 4 in the record on appeal.

1   male saying, "see what you made me do."  (Id., at 124, 331.)

2           At trial, Mayo testified that he had been asleep in his bedroom when he was

3   awakened by a commotion, shouting and the sound of someone bumping against the wall.  (Id., at

4   118-19, 154.)  Mayo recognized one of the voices as belonging to the victim's sister, Percilla

5   Rubit.  (Id., at 119, 241.)  Mayo claimed that he came out of the bedroom and saw "a bunch of

6   women" gathered around the victim.  (Id., at 119.)  The victim was sitting on the floor, leaning

7   against a wall.  She was bleeding profusely from her neck, and Percilla was holding a towel to

8   the wound.  (Id., at 120.)  Mayo testified that the women asked him to go to the corner to see if

9   petitioner was present.  Mayo walked to the corner of 33rd Street and 10th Avenue and saw

10   petitioner leaning into a police car near the Oak Park Market on 12th Avenue.[2]  (Id., at 121-22.)

11           Mayo's testimony then began to differ from what he had told the police on the day

12   of the incident.  Mayo claimed that he suffers from Post Traumatic Syndrome as a result of his

13   service in Vietnam and that he was under several medications, including anti-depressants and

14   sleep aids, on the day of the incident.  (Id., at 124-25.)  Mayo claimed that he told the police

15   officers on the day of the incident about his use of medications and noted that he had gone to the

16   district attorney's office on August 13 and informed a representative of the district attorney's

17   office that he could not remember what he heard on the day of the incident because of his use of

18   the medications.[3]  (Id., at 125-26, 129.)

19           When questioned whether he had spoken to petitioner since the incident, Mayo

20   acknowledged that he had spoken to petitioner on the telephone a "couple times" but claimed

21   that they had not talked about the case.  (Id., at 127.)  When pressed, Mayo acknowledged that he

22   had engaged in one conversation with petitioner about the incident, and they had discussed what

23
_____

24   [2]  Sacramento Police Officer Michael Lange was the officer who made contact with
     petitioner near the Oak Park Market.  (Id., at 306-08.)

25   [3]  Sacramento Police Officer Michelle Beattie, the officer who interviewed Mayo when he
     mentioned hearing a male voice say "see what you made me do," denied that Mayo mentioned
26   any medications.  (Id., at 331.)

Mayo had seen or heard.  (<u>Id</u>., at 127-28.)

The prosecution then played for Mayo and the jury a tape recording of a conversation that had taken place between Mayo and petitioner approximately two days before Mayo spoke to the district attorney's representative.  (<u>Id</u>., at 128-29.)  In the conversation, petitioner told Mayo that he had heard that some people were "running their mouths" and that he had learned that Mayo had claimed to have overheard the statement from petitioner, "look what you made me do."  Petitioner told Mayo that he (petitioner) had not been at the scene of the incident, and Mayo replied, "O.K."  Petitioner also advised Mayo that he expected to get out of jail and be home on the following Tuesday.  (People's Exhibit 3.)

Mayo testified at trial that he did not feel threatened as a result of the conversation and that he went to the district attorney's office two days thereafter only to make sure they understood that he was on medication.  (RT at 129-30.)  At the same time, Mayo acknowledged that on July 5, 2001, he had called 911 to report a threat by petitioner because he felt intimidated.  (<u>Id</u>., at 130, 151-52.)  Moreover, Mayo testified that he had received "possibly one or two" more threats in connection with his testimony.  (<u>Id</u>., at 153.)  Finally, Mayo acknowledged that he did not want to testify and was there only under subpoena.  (<u>Id</u>., at 131.)

Mayo then confirmed that on the day of the incident, he believed he heard a male voice say, "see what you made me do" and then, "leave me alone."  (<u>Id</u>., at 131-32.)

The victim's fourteen-year-old son, Jerry Shaver, lived with his father across the street from the victim.[4]  (<u>Id</u>., at 114-15, 157-58.)  On the day of the incident, Shaver had been to his mother's house and had seen petitioner and his mother drinking out of a large glass beer bottle.  (<u>Id</u>., at 163-64.)  Shaver returned to his father's house, and approximately five to eight minutes later, returned to his mother's house.  (<u>Id</u>., at 164.)  As he approached the front door of
////

---

[4] Shaver also acknowledged that he did not want to testify at trial.  (<u>Id</u>., at 161.)

the house, petitioner passed by him and appeared intoxicated.[5]  (Id., at 161, 164.)  When Shaver

entered his mother's house, his aunts, Percilla Rubit, Roberta and Jetty,[6] were screaming, and his

mother was on the ground bleeding.  (Id., at 164-65, 179.)  Shaver got a towel from his mother

and then ran back outside and went down the street and asked petitioner why he had hit his

mother.[7]  (Id., at 168-69.)  Petitioner replied that he had not meant to do anything and that the

victim had smashed his finger in the door.  (Id., at 169.)  Shaver then flagged down the police

who put petitioner in the back of a car and returned to the victim's house.  (Id., at 170.)

Shaver testified that petitioner and his mother commonly argued when they were

intoxicated.  (Id., at 171.)  Matters sometimes became physical, and Shaver had seen petitioner

hit his mother and had seen his mother throw something at petitioner.  On some occasions,

Shaver or his sister had called the police.  (Id., at 171-73.)

Dr. Robert Oliver, the emergency room physician who treated the victim, testified

that by the time the victim reached the hospital, her injuries were dangerous.  She had lost a lot of

blood and Dr. Oliver called in a surgeon to treat a penetrating injury to her neck.  (Id., at 198-

201.)  When Dr. Oliver asked the victim how she had sustained her injuries, she replied that her

////

---

[5]  Shaver also observed that his mother was intoxicated that day.  (Id., at 180.)

[6]   There were varying accounts of who may have been present during the chaos which occurred while the victim was bleeding.  Shaver testified that his aunts, Roberta and Jetty, were present and later mentioned that he sometimes referred to Roberta as "Auntie Lynn."  (Id., at 165, 168-69.)  Percilla, the victim's sister, was present at the scene and denied that anyone named Roberta had been present.  (Id., at 264.)  However, the caller to 911 identified herself as the victim's sister, Roberta.  (People's Exhibit 1.)  At the same time, Percilla testified that a woman named Lynn had been in the living room at the time of the incident.  Percilla also indicated that Jetty, who is Shaver's aunt (apparently on his father's side), had been present but had arrived after the victim suffered her injuries.  (RT at 275, 290.)  The victim denied that individuals named Lynn or Roberta were at her house on the day of the incident.  (Id., at 355-56.)  Mayo believed that the victim's daughter, Ne-Ne, as well as a woman named Jetta may have been present.  (Id., at 121.)  Shaver confirmed that Mayo had been sleeping and came into the room only after Shaver had arrived.  (Id., at 165-66.)

[7]  Shaver testified that Jetty and Lynn told him that petitioner had hit the victim.

1   boyfriend had struck her with a bottle.[8]  (Id., at 206.)

2            Dr. Oliver testified that the victim's injuries were inconsistent with someone

3   falling onto a broken glass, bottle or jar.  (Id., at 212.)  Instead, the injuries indicated "this was a

4   forward motion of a piece of glass that was already broken, such as an individual holding a

5   bottleneck of the bottle broken off and going in a forward motion." [9]  (Id., at 228.)

6            Elizabeth Garcia, a supervisor of the emergency department where the victim was

7   admitted, took a history from the victim and asked how she had sustained her injuries.  The

8   victim replied that her boyfriend had caused them.  (Id., at 233.)

9            Percilla Rubit, the victim's sister, testified that at the time of the incident she and

10  a woman named Lynn were in the living room and the victim and petitioner were arguing in the

11  bedroom.  During that time, petitioner had a forty ounce bottle of beer.  (Id., at 254-55.)  Percilla

12  testified that she then suddenly "heard a pow" which sounded like a beer bottle shattering and

13  then "a little bit later my sister came out, fell on the floor and a little bit after that Eugene looked

14  at my sister and held his hands up and said 'f' it, 'f' it.  Then he left the house."  (Id., at 254,

15  258.)

16           Percilla testified that the victim had asked her not to come to court and testify, or

17  to invoke the Fifth Amendment.  (Id., at 299.)  The victim also asked her on several occasions to

18  change her story so that petitioner would not get in trouble.  (Id., at 300.)

19           Percilla acknowledged that she had seen petitioner hit the victim in the past.  (Id.,

20  at 265.)

21           The victim, Sonya Bennett, testified at trial that the injuries she sustained occurred

22  ////

23

24           [8]  At approximately 4:40 p.m., the victim's blood alcohol level was .266, over three times
    the legal limit for driving.  (Id., at 203-04.)

25

26           [9]  A piece of glass which was removed from the victim's neck was introduced in
    evidence.  (Id., at 417-18.)

when she fell in her bedroom after dropping a pickle jar from which she had been drinking.[10] (Id., at 357-63.) She acknowledged that petitioner had been at her house on the morning of the incident but claimed that he was not present at the time she sustained her injuries.[11] She further claimed that the only persons she could recall being present at the time the injuries occurred were Percilla, who was in the living room, and possibly Mayo.[12] (Id., at 340, 363.)

The victim acknowledged that she and her sister had been drinking on the day of the incident. The victim thought she had consumed "maybe two or three six packs and probably a bottle – maybe some wine." (Id., at 357-58.) She claimed that she did not begin drinking until 6 p.m. When confronted with the fact that the police had responded to the incident at approximately 4 p.m., the victim showed great confusion. (Id., at 343-44.)

The victim testified that she did not recall having told the doctor at the hospital that her boyfriend had inflicted the injuries on her. Instead, the victim indicated that she believed she had told the doctor to get her boyfriend. (Id., at 346.) The prosecution then played for the jury a tape of a telephone conversation from the jail in which petitioner suggested to the victim the very thing to which she had testified, i.e. that when the victim made the statements to the doctor, it "could have been [the victim] calling out for [petitioner]." (Id., at 346-48; Exhibit 2.) The victim denied the conversation was the genesis for her testimony. (RT at 347.)

The victim acknowledged having visited petitioner in jail on at least thirty occasions and having participated in at least sixty telephone conversations with him.[13] (Id., at 346.) When asked whether any of the telephone conversations with petitioner had been about the

---

[10] She acknowledged that the injuries she sustained caused permanent scarring to her ear and underneath her cheek. (Id., at 359-63.)

[11] The prosecutor was allowed to question the victim as a hostile witness. (Id., at 343.)

[12] She expressly denied that individuals named Lynn or Roberta were at her house on the day of the incident. (Id., at 355-56.)

[13] Jail records established that petitioner made sixty-three telephone calls from the jail to the victim's residence. (Id., at 457.)

1  case, the victim responded,

2  > Well, I don't think – maybe if I did – I can't remember because I
   believe I had already talked to him.  He already knew I think
3  probably from only one of my family members that I had slip and
   fell because he wasn't even there that night, sir.
4

5  (Id., at 352.)[14]

6        When asked whether she had ever talked to petitioner about what Mayo had seen

7  on the day of the incident, the victim claimed she had never had any such conversation.  (Id., at

8  354.)  An audiotape of a telephone conversation was then played for the jury in which petitioner

9  told the victim that he had "figured out what happened."  Petitioner then suggested that Mayo

10 had "thought" he heard the things he claimed to have heard, but that Mayo had been waking up

11 from his psychotropic drugs.  Petitioner further suggested that he (petitioner) had been at the

12 market when the incident occurred and had come home only to find the victim injured.[15]  (Exhibit

13 9.)

14       The victim also denied that she had ever talked with petitioner about the

15 testimony of Percilla.  (RT at 358.)  The prosecutor then played for the jury the tape of a

16 telephone conversation in which petitioner told the victim that he had spoken to his public

17 defender and learned that Percilla "has got to be got to" and needs to "change her tune."  (Exhibit

18 6.)  The victim then claimed that she recalled the conversation but that she never talked to

19 Percilla.  (RT at 359.)  The victim also claimed not able to recall having ever told her sister not to

20 come to court and testify.  (Id., at 350-51.)

21       The victim claimed that if she told people on the day of the incident not to talk to

22

---

23    [14]  In connection with this testimony, the prosecutor played for the jury another audiotape
24 of a telephone conversation between petitioner and the victim.  Unfortunately, the copy of this
   exhibit (Exhibit 8) which was provided to respondent is blank.

25    [15]  The victim testified that she has known petitioner for nineteen years and was engaged
26 to him at the time of the incident.  (Id., at 339.)  Percilla testified that at the time of the incident
   petitioner and the victim were dating but not engaged.  (Id., at 241.)

police, it was because she was embarrassed that she had been drinking and had drugs in her system.  (Id., at 350-51.)

The victim also denied that on July 6, 2000, she had called 911 regarding another incident in which she reported that petitioner had hit her three times in the head.  When confronted with a police report about the incident, the victim claimed she didn't think she had reported such an incident.  She then claimed not to have any recollection of the matter.  (Id., at 365.)

Sacramento Police Officer Jason Collins testified that on July 6, 2000, he responded to a domestic violence call in which the victim alleged that petitioner had hit her with his fists on each side of her head and in her mouth.  The victim had a swollen lower lip and complained of pain to both of her ears.  (Id., at 404-05.)

Timony Sardelich, an identification technician for the Sacramento Police Department, testified that he was sent to the victim's residence on July 6, 2000, to take pictures of injuries the victim had sustained in a domestic violence incident.  However, the victim refused to be photographed.  (Id., at 326-28.)

IV.  Discussion

A.  Claim 1 – Alleged Ineffective Assistance of Counsel

Petitioner raises several claims of alleged ineffective assistance of counsel.

*Legal Standard*

The test for demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Id. at 688.  To this end, the petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at 690.  The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  Id.  "We strongly presume that counsel's

conduct was within the wide range of reasonable assistance, and that he exercised acceptable

professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702

(9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.

In extraordinary cases, ineffective assistance of counsel claims are evaluated

based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93 (2000)

(citing Lockhart v. Fretwell, 506 U.S. 364 (1993)).

The Supreme Court has emphasized the importance of giving deference

to trial counsel's decisions, especially in the AEDPA context:

> In Strickland we said that "[j]udicial scrutiny of a counsel's
> performance must be highly deferential" and that "every effort
> [must] be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and
> to evaluate the conduct from counsel's perspective at the time."
> 466 U.S. at 689.  Thus, even when a court is presented with an
> ineffective-assistance claim not subject to § 2254(d)(1) deference,
> a [petitioner] must overcome the "presumption that, under the
> circumstances, the challenged action 'might be considered sound
> trial strategy.'"  Ibid. (quoting Michel v. Louisiana, 350 U.S. 91,
> 101 (1955)).

> For [petitioner] to succeed, however, he must do more than show
> that he would have satisfied Strickland's test if his claim were
> being analyzed in the first instance, because under § 2254(d)(1), it
> is not enough to convince a federal habeas court that, in its
> independent judgment, the state-court decision applied Strickland
> incorrectly.  See Williams, supra, at 411.[16] Rather, he must show
> that the [ ]Court of Appeals applied Strickland to the facts of his
> case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-99 (2002).

---

[16]  This internal citation should be corrected to Williams v. Kaiser, 323 U.S. 471, 477
(1945).

*Failure to Subpoena Witnesses*

Petitioner argues that his counsel was ineffective for failing to call three witnesses who could have testified on his behalf.  In particular, petitioner argues that trial counsel should have called 1) the manager of Food King; 2) Sonya Bennett's nephew, Stevie; and 3) petitioner's grandmother.  (Dkt. 14, at 52-53 of 107.)  Petitioner does not offer any declarations by these individuals in support of this claim.  Rather, he appears to rely on his own declaration attached as an exhibit to the amended petition.  (Dkt. 14-1, at 67-123 of 140.)

In his declaration, petitioner states that shortly after 10:00 a.m. on June 30, 2001, he left the house he shared with Bennett and went to his grandmother's house.  (Id., at 67.)  After checking on his grandmother, he returned to Bennett's house at around 12:50 p.m.  (Id., at 68.)  Between 2:00 and 3:00 p.m., Rubit arrived at the house.  (Id.)  Some time, later, petitioner left to go to Food King Supermarket.  (Id., at 70.)  As petitioner left the house, he saw Bennett's nephew, Stevie.  (Id., at 71.)  Petitioner was gone for approximately 30-35 minutes.  (Id.)  When he returned to Bennett's house he saw Rubit on the floor.  (Id., at 72.)  Rubit was apparently helping Bennett.  Rubit would not let him help Bennett, who was injured.  (Id., at 73.)  Petitioner then went to the Oak Park Market to call 911.  (Id.)

This claim of alleged ineffective assistance of counsel is unsupported because petitioner did not provide declarations by the three people he claims counsel should have called as witnesses.  The court has no way of knowing whether these three people would have testified as petitioner claims they would have in his self-serving declaration.  Moreover, considering the strength of the evidence against petitioner, including the victim's statements to Dr. Oliver and Nurse Garcia that petitioner inflicted the injuries, it is highly unlikely that the outcome of the trial would have been different had these witnesses testified.  For these reasons, this claim of ineffective assistance of counsel is without merit.

*Cross-Examination of Rubit*

Citing page 297 of the reporter's transcript, petitioner contends that during trial

counsel's cross-examination of Rubit, she testified that she did not see petitioner with a broken bottle in his hand.  (Dkt. 14, at 55.)  Citing page 538 of the reporter's transcript, petitioner argues that during closing argument, trial counsel was ineffective for arguing that Rubit saw him with a broken bottle.  (Id.)

Petitioner is correct that on cross-examination, Rubit testified that she did not see petitioner with a broken bottle.  (RT, at 297.)  While Rubit testified that she saw petitioner go into the bedroom holding a beer bottle, she testified that she did not see him come out of the room holding a broken beer bottle.  (Id.)  Petitioner is correct that during closing argument, trial counsel erroneously stated that Rubit testified that she saw petitioner holding a broken beer bottle:

> What was the effect of these phone calls?  Well, if there were threats to Miss Rubit they must not have been too threatening because she came in and testified and she testified similarly to what she testified to before, that she had seen Byron at the end of the hall and then he came out with a broken bottle.  Didn't change her testimony a bit.

(RT, at 538.)

Because the evidence against petitioner was very strong, it is unlikely that counsel's misstatement of Rubit's testimony during closing argument affected the outcome of the trial.  Moreover, the jury was instructed that statements made by the attorneys during the trial were not evidence.  (CT at 224.)  See Richardson v. Marsh, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions").  For these reasons, this claim of alleged ineffective assistance of counsel is without merit.

*Counsel's statement: "If it don't fit, you must acquit."*

Petitioner argues that trial counsel was ineffective for stating, as he was putting on gloves to handle a piece of glass removed from the victim's neck, "If it don't fit, you must acquit."  (Dkt. 14, at 56-57.)  Petitioner argues that after this statement was made, everyone in the court room except petitioner laughed.  (Id.)  Petitioner argues that this statement, taken from

14

1   the infamous O.J. Simpson trial, inflamed the jury against petitioner.  (Id.)  Petitioner appears to

2   argue that this comment was not recorded by the court reporter as it is not found in the reporter's

3   transcript.  (Id.)

4          Assuming counsel made this comment, it is not likely that it impacted the

5   outcome of the trial.  Considering the context in which the statement was allegedly made, the

6   undersigned does not find that it was particularly prejudicial to petitioner.  In any event,

7   considering the strong evidence against petitioner, it is not likely that the jury was impacted by

8   this single comment.  Moreover, as stated above, the jury was instructed that statements made by

9   the attorneys during the trial were not evidence.  (CT at 224.)   For these reasons, this claim of

10  alleged ineffective assistance of counsel is without merit.

11          *Failure to Obtain Glass*

12          Petitioner argues that his trial counsel was ineffective for failing to obtain the

13  glass which Crime Scene Investigator ("CSI") Freschette photographed but failed to collect.

14  (Dkt. No. 14, at 57-58.)  Petitioner argues that his counsel should have argued that with no

15  preservation of the glass from the floor, there was no conclusive evidence as to whether the glass

16  was from a 40 ounce beer bottle or the glass that the victim claimed she was drinking out of that

17  she subsequently dropped then fell on.  (Id.)

18          Bennett's claim that the injuries were caused when she fell on a broken pickle jar

19  was not supported by the evidence.  She told Dr. Oliver and Nurse Garcia that petitioner caused

20  her injuries.  Dr. Oliver testified that her injuries were not consistent with her version of events.

21  Bennett's testimony that petitioner was not present when she suffered the injuries was

22  contradicted by the testimony of Rubit and her son.  Because of the strong evidence against

23  petitioner, the undersigned finds that he has not demonstrated that he was prejudiced by

24  counsel's failure to argue that there was no conclusive evidence as to whether the broken glass

25  was from a 40 ounce beer bottle or a pickle jar.  The instant claim of alleged ineffective

26  assistance of counsel is without merit.

*Failure to Hire a Defense Expert*

Petitioner argues that his counsel was ineffective for failing to hire an expert witness in support of his defense. (Dkt. No. 14, at 59.)  In support of this argument, petitioner contends that the victim, on her own volition, went to the District Attorney's office the day after his arrest and gave her version of events. (Id., at 58.)  Petitioner contends that the victim gave her story to the District Attorney even before she had a chance to talk to petitioner. (Id.) It is unclear to the undersigned what petitioner is claiming an expert witness would have testified to.

In support of this claim, petitioner asks the court to refer to page 38 of his 66 page petition filed in Superior Court and the California Court of Appeal.  Attached as an exhibit to the amended petition is an exhibit which appears to be the document petitioner refers to in support of this claim.  After reviewing page 38 of this 66 page pleading, the undersigned finds no discussion regarding an expert witness. (Dkt. No. 14-1, at 104 of 140.)

Petitioner may be arguing that counsel should have hired an expert to testify regarding the effect of the medications on Mayo's ability to perceive events.  However, this claim is conclusory and unsupported.  See, e.g., James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

In the traverse, petitioner suggests that counsel was ineffective for not hiring an expert witness to testify in support of the victim's version of how she suffered her injuries. (Dkt. No. 34, at 26 of 52.)  Petitioner has provided no evidence suggesting that an expert would have been able to testify in support of the victim's version of events.  Because this claim is conclusory and unsupported, it should be denied.

For the reasons discussed above, the instant claim of alleged ineffective assistance of counsel is without merit.

////

*Alleged Juror Misconduct*

Petitioner argues that his counsel was ineffective for failing to ask for a mistrial, a new jury trial or removal of alternate juror number one based on possible juror misconduct.  In support of this claim, petitioner cites pages 31-34 of the reporter's augmented transcript ("RAT").  At these pages of the RAT, during voir dire, prospective juror Rico reported that while she was in the ladies' room, she overheard another prospective juror saying that if she was smart, she would say petitioner was guilty because he was in custody.  (RAT, at 33.)  The trial court asked juror Rico if she thought the juror's comment reflected a plan to get off the panel.  (<u>Id</u>.) Rico answered that she did not know.  (<u>Id</u>.)  After identifying the juror who had made the comment, the trial court called her into chambers and questioned her:

Court: What is your name?

A: (REDACTED) ALTERNATE JUROR NUMBER ONE.

Trial Counsel: Number 59.

Court: Miss (REDACTED), the Court had it reported through the bailiff that there was some comments you made about the defendant's custody status?

A: Oh, we were just joking in the bathroom, in line in the bathroom saying if we all wanted to go home we would just say he's guilty because of his custody status.  We were just joking.  But no, I don't believe that.

Court: Are you satisfied that if you're called as a juror that you would be able to resolve this matter without any reference to the defendant's custody status?

A: Sure.

Court: And you understand it can be kind of awkward when you think you're joking, you understand it's joking and other people take it in a different fashion.

A: Sorry about that.  No.

Court: Either counsel desire to question (REDACTED) ALTERNATE JUROR NUMBER ONE?

Trial Counsel: No questions.  Thank you.

1    Court: Let's bring the panel in and let's go.

2    (REDACTED) ALTERNATE JUROR NUMBER ONE: Sorry.
     We were just a long line in the ladies room.

3

4    (RAT at 34.)

5          The RAT refers to the juror who made the at-issue comments as "Alternate Juror

6    Number One."  From this identification the undersigned infers that this juror was, in fact,

7    alternate juror number one.  Alternate juror number one was not involved in any of the

8    deliberations.  To the extent petitioner claims that counsel failed to remove alternate juror

9    number one because she was potentially biased against him based on his custody status, this

10   claim is without merit because she was not involved in the deliberations.  See United States v.

11   Quintero-Barraza, 78 F.3d 1344, 1349 (9th Cir. 1995) (establishing Strickland prejudice in the

12   context of juror selection requires a showing that, as a result of trial counsel's failure to exercise

13   peremptory challenges, the jury panel contained at least one juror who was biased.)  In addition,

14   her comments did not clearly demonstrate bias as she clarified that they were solely meant as a

15   joke regarding how to avoid jury duty.

16         Petitioner also appears to argue that alternate juror number one's comments, made

17   in the presence of other jurors in the ladies' room, prejudiced the potential jurors who heard the

18   comments, including those who actually sat on the jury.  Petitioner appears to argue that

19   alternative juror number one's comments suggested that he was guilty simply because he was in

20   custody.

21         A motion for a new jury panel or a motion for a mistrial on grounds that alternate

22   juror number one's comments prejudiced the entire panel would have been denied.  The at-issue

23   comment was clearly a poor attempt at humor regarding how to avoid jury duty.  In addition,

24   during voir dire the trial court instructed the jury that petitioner's custody status was no reflection

25   on whether he was guilty.  (RAT at 31.)  For these reasons, it is unlikely that the at-issue

26   comment made by alternate juror number one in the ladies' room prejudiced any potential juror

who heard it.  For these reasons, this claim of alleged ineffective assistance of counsel is without

merit.

*Failure to Object to Alleged Prosecutorial Misconduct*

Petitioner argues that his counsel was ineffective for failing to object to the

prosecutor's closing argument regarding the timing of his arrest, which was approximately one

month after the incident.  (Dkt. No. 14, at 61-62.)  Petitioner argues that counsel should have

objected to the argument quoted herein:

> Do you know what?  Think of the system we would live in if the
> cops went out there that day and said, you know what, he's here
> and hook him up.  But you know, the system.  Mr. Roehr says, he
> defends it, worked perfectly that day because not until the evidence
> was gathered was the defendant arrested.  They didn't go out there
> and judge somebody and jump to conclusions.  When they got the
> information from the doctor, from the witnesses that evening the
> defendant was arrested.  The officers were sent out on a warrant to
> arrest him and he was picked up approximately a month later.

(RT, at 548.)

Petitioner appears to claim that the prosecutor's argument conceded that because

they did not have enough evidence to arrest him on June 30, 2001, they had to come up with false

evidence to arrest him one month later.  On this ground, petitioner contends that his trial counsel

should have objected to the argument quoted above.

An objection by trial counsel to the argument above on the grounds now urged by

petitioner had no merit and would have been denied.  For this reason, this claim of alleged

ineffective assistance of counsel is without merit.

*Failure to Listen to Telephone Tapes*

Petitioner argues that before the trial, his counsel told petitioner that he would

listen to the 63 or 64 taped telephone conversations between petitioner and the victim to

determine if they contained any statements beneficial to the defense.  (Dkt. 14, at 63.)  Petitioner

argues that counsel obviously did not listen to the tapes because he did not offer any of them as

defense evidence.  (Id.)  Petitioner argues that there were "plenty of conversations" between

19

1  petitioner and the victim which would have helped the defense.  (Id.)  Petitioner argues that

2  during the taped conversations, the victim repeatedly made reference to his innocence.  (Id., at

3  64.)  Petitioner also claims that the victim made reference to drive-by shootings that members of

4  her children's family provoked.  (Id.)

5            It is petitioner's burden to demonstrate that the tapes contained exculpatory

6  evidence.   Accordingly, the undersigned will address only the two types of statements allegedly

7  contained in the tapes identified by petitioner in the amended petition.

8            Had the jury heard repeated statements by the victim on the tapes that petitioner

9  was innocent, it is not likely that the outcome of the trial would have been different.  The

10  evidence against petitioner was strong.  The evidence that the victim was not telling the truth and

11  was trying to protect petitioner was strong.  Accordingly, petitioner was not prejudiced by

12  counsel's failure to introduce these statements allegedly contained in the tapes.

13            It is unclear how evidence that members of the victim's family provoked drive-by

14  shootings was exculpatory.  For this reason and because the evidence against petitioner was

15  strong, petitioner was not prejudiced by counsel's failure to introduce these statements allegedly

16  contained in the tapes.

17            In support of this claim, petitioner also argues that his counsel had documents and

18  sheriff's reports which could have shed light on the victim's drinking problem.  However,

19  evidence was presented that clearly suggested that the victim had a drinking problem.  It is not

20  likely that outcome of the trial would have been different had the jury heard additional evidence

21  regarding this matter.  For this reason and because of the strong evidence against petitioner,

22  petitioner was not prejudiced by trial counsel's failure to produce additional evidence of the

23  victim's drinking problem.

24            *Failure to Challenge Warrantless Arrest*

25            Petitioner argues that his counsel was ineffective for failing to challenge his arrest

26  on grounds that it was warrantless.  (Dkt. No. 14, at 64-70.)  Petitioner contends that when

1    Officer Johnson arrived at the victim's house to arrest petitioner, the victim asked to see a

2    warrant. (Id., at 65.)  Petitioner claims that the victim then told the officer to leave. (Id.)  The

3    officer refused to leave, then began to search the house looking for petitioner. (Id., at 66.)

4           A copy of the report by arresting Officer Johnson of the arrest is attached as an

5    exhibit to the petition. (Dkt. 14-2, at 40 of 173.)  Officer Johnson states that on July 25, 2001, he

6    went to the victim's house to arrest petitioner. (Id.)  When he arrived, he walked up to the open

7    front door and knocked, announcing "Sacramento Police." (Id.)  The victim walked out of a back

8    bedroom into the hallway. (Id.)  Officer Johnson asked if he could come in. (Id.)  The victim

9    replied, "Wait a minute.  I'm getting my kids dressed." (Id.)  The victim then put a shirt on a

10   small child and walked up to the front door. (Id.)  Officer Johnson asked if he could come in and

11   talk and she said, "Sure, what's going on." (Id.)  Officer Johnson stepped inside and asked if

12   petitioner was in there. (Id.)  The victim responded that he was in the bedroom and then asked,

13   "What's going on?  Get out of my house." (Id.)  Officer Johnson walked further into the house

14   and arrested petitioner. (Id., at 40-41.)

15          Even in the absence of exigent circumstances, a warrantless entry into a home to

16   make an arrest does not violate constitutional search and seizure principles when the arresting

17   officer has the occupant's consent to enter the home.  See People v. Newton, 107 Cal.App.3d

18   568, 577 (1980).  On the other hand, the law does not "mandate[ ] that a consent to enter a home,

19   in order to validate a warrantless arrest within the home, must consist of an express consent to

20   the officers to enter to make an arrest." Id., at 578.  In People v. Newton, officers obtained

21   permission from the defendant's common law wife to enter the defendant's home and look for

22   him. Id., at 572, 578.  "Although the officers did not expressly state to [the common law wife]

23   that they wanted to come in the home in order to arrest defendant," the court found her consent

24   was sufficient to allow the officers "to enter to find defendant for any purpose they desired, either

25   to question him or to arrest him." Id., at 578. The court held that the "governing principle of the

26   scope of consent is that of the reasonable expectation of the officer derived from the words used

1   and other actions on the part of the occupant giving consent." Id.

2          In the instant case, when Officer Johnson asked to enter the house he did not tell

3   the victim that he was there to talk to or arrest petitioner.  Arguably, under these circumstances,

4   the scope of the victim's consent authorizing entry did not include the arrest of petitioner.

5          However, under California law, as long as the police have probable cause to

6   arrest, an improper entry into a home to make a warrantless arrest does not invalidate the arrest.

7   See People v. Marquez, 1 Cal.4th 553, 568-69 (1992); People v. Watkins, 26 Cal.App.4th 19, 29

8   (1994).  In the instant case, because it is clear that the arresting officers had probable cause to

9   arrest petitioner, a motion to suppress or to invalidate the arrest on grounds that the victim did

10   not properly consent to their entry would have been denied.  For this reason, trial counsel was not

11   ineffective for failing to challenge the validity of petitioner's arrest.

12          *Alleged Failure to Investigate Mental Illness*

13          Petitioner argues that his trial counsel failed to investigate his mental condition.

14   (Dkt. 14, at 70.)  In support of this claim, petitioner cites page 582 of the reporter's transcript

15   where his counsel addressed the court prior to sentencing:

16          There's one thing I want to address on page 11 of the probation
       report, and that is, the indication that in 1987 Mr. Johnson was
17          diagnosed with schizophrenia.  Mr. Johnson and I have conferred
       with each other from time to time.  We've sat in court for a trial.
18          During all of that time I have seen no evidence of any mental
       disease or disorder that approximates schizophrenia based on my
19          almost 30 years of experience dealing with accused criminals.

20          I have seen a number of individuals who appeared to suffer from
       that mental disorder.  Either Mr. Johnson's disorder, if he had it, is
21          in remission or perhaps it was misdiagnosed as some sort of
       psychosis secondary to withdrawal from substance abuse.  I don't
22          know just what the case was.  I think it's important to note as far as
       I'm concerned, during the entirety of these legal proceedings he has
23          appeared to me to be in good mental condition.

24          He has written a number of documents to the Court which I think
       are not just brash but articulate.  He speaks well, he writes well.
25          So I'm concerned that this indication of schizophrenia in here may
       suggest that there was some play of mental illness either at the time
26          of the offense, which wasn't picked up, or during the course of the

1    trial and that's just not the case.

2    (RT at 582-83.)

3    Trial counsel's comments were made in response to the following statement

4    contained in the probation report:

5    He [petitioner] further indicated that in 1987, he was diagnosed
     with schizophrenia and stated his doctor at Kaiser Hospital has
6    prescribed Haldol and Cogentin, which he has not taken for a
     while.  The defendant noted he is not currently under a doctor's
7    care.

8    (CT at 275.)

9    Petitioner's suggestion that counsel was ineffective for failing to present a defense

10   based on his mental illness is unsupported by the record.  Other than petitioner's statement in the

11   probation report that he was allegedly diagnosed with schizophrenia in 1987, there is no evidence

12   that petitioner suffered from mental illness.  Trial counsel clearly states that he saw no evidence

13   of mental illness during his representation of petitioner.  For these reasons, the instant claim is

14   unsupported and should be denied.

15   *Alleged Failure to Request Jury Instruction*

16   Petitioner argues that his counsel was ineffective for failing to request a "mere

17   presence" instruction which would have instructed the jury that mere presence at the scene of the

18   crime is not sufficient to prove guilt.  (Dkt. No. 14, at 71.)  Such an instruction would have been

19   inconsistent with petitioner's defense which was that no crime occurred, i.e. the victim slipped

20   and fell on a broken bottle.  It also was inconsistent with the defense that he was not present

21   when the victim sustained her injuries.  For these reasons, counsel was not ineffective for failing

22   to request this instruction.

23   *Alleged Failure to Challenge Victim's Statements*

24   Petitioner appears to argue that counsel was ineffective for failing to adequately

25   challenge the reliability of the victim's statements at the hospital that her boyfriend, i.e.

26   petitioner, caused her injuries.  (Dkt. 14, at 72.)  Petitioner argues that the statements were not

1    reliable based on the victim's intoxication and that she had been hit on the head with a bottle.

2    (Id.)

3         As discussed above, at trial the victim denied stating at the hospital that petitioner

4    had hit her.  Rather, she testified that she was actually calling out for petitioner.  The victim also

5    denied that she had been hit on the head with a bottle.  Based on this testimony, a challenge by

6    counsel to the "reliability" of the victim's statements at the hospital, as testified to by Doctor

7    Oliver and Nurse Garcia, would have been inconsistent with the defense.  For these reasons,

8    counsel was not ineffective for failing to adequately challenge the reliability of these statements

9    on the grounds now urged by petitioner.

10         *Alleged Failure to Submit Rubit's Arrest Record*

11         Petitioner argues that counsel was ineffective for failing to adequately challenge

12    the credibility of prosecution witness Rubit by admitting her arrest record.  (Dkt. No. 14, at 72.)

13    In support of this claim, petitioner cites a minute order from his trial dated November 14, 2001.

14    (Dkt. 14, at 14-2, at 117 of 173.)  This minute order reflects that a bench warrant was issued on

15    that date for Rubit.  (Id.)  It appears that the warrant was issued based on her failure to appear in

16    court that day.  (Id.)

17         Based on the strong evidence against petitioner, had the jury heard evidence that a

18    warrant had been issued against Rubit based on her failure to appear in court on November 14,

19    2001, it is not likely that the outcome of the trial would have been different.  Accordingly,

20    counsel was not ineffective for failing to present this evidence.

21         Petitioner also claims that counsel was ineffective for failing to obtain documents

22    regarding Rubit from Child Protective Services, as well as any mental health records or other

23    records showing that she made false complaints.  (Dkt. No. 14, at 72-73.)  Petitioner has

24    presented no evidence suggesting that any of these records exist or that they would have

25    impacted the outcome of the trial.  Accordingly, this claim of alleged ineffective assistance of

26    counsel is without merit.

1      *Conclusion*

2              After conducting an AEDPA review, the undersigned recommends that

3      petitioner's ineffective assistance of counsel claims be denied.

4              B.  Claim 2 – Alleged Prosecutorial Misconduct

5              *Procedural Default*

6              Respondent argues that claim 2 is procedurally defaulted because the Sacramento

7      County Superior Court denied this claim by order citing In re Dixon, 41 Cal.2d 756 (1953).

8              Federal courts may reach the merits of habeas petitions despite an asserted

9      procedural bar so long as they are clearly not meritorious.  Franklin v. Johnson, 290 F.3d 1223,

10     1232 (9th Cir. 2002), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997).  Because the

11     instant claim is without merit, the undersigned will not reach the procedural bar issue.

12             *Legal Standard*

13             Prosecutorial misconduct rises to the level of constitutional deprivation only when

14     it "so [infects] the trial with unfairness as to make the resulting conviction a denial of due

15     process."  Darden v. Wainright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo,

16     416 U.S. 637, 643 (1984)).  It is not enough that a prosecutor's remarks were undesirable or even

17     universally condemned.  Id., at 181.  Rather, the relevant question is whether they so infected the

18     trial with unfairness as to make the resulting conviction a denial of due process.  Id

19             *Closing Argument*

20             Petitioner argues that during closing argument, the prosecutor falsely stated that

21     petitioner had been arrested pursuant to an arrest warrant.  (Dkt. 14, at 77-78 of 107.)  In support

22     of this claim, petitioner cites page 548 of the reporter's transcript where the prosecutor argued,

23     "The officers were sent out on a warrant to arrest him and he was picked up approximately a

24     month later."  (RT at 548.)

25             As discussed above, petitioner was not arrested pursuant to an arrest warrant.

26     Therefore, the prosecutor's argument above misstated the evidence.  However, as stated above,

the jury was instructed that statements made by the attorneys during the trial were not evidence. (CT at 224.)  See Richardson v. Marsh, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions").  For this reason, and because the misstatement was a relatively minor mischaracterization of the evidence, the challenged argument did not so infect the trial with unfairness so as to make the resulting conviction a denial of due process.

In the answer, respondent identifies another claim of alleged prosecutorial misconduct during closing argument raised in the Superior Court, although not clearly raised in the amended petition.  In an abundance of caution, the undersigned will address this claim.  The Superior Court addressed this claim as stated herein:

> While petitioner claims the prosecutor frequently mischaracterized evidence, most of those incidents would not have been arguable on appeal because trial counsel did not object.  The only objection shown in the exhibits was to a portion of the prosecutor's closing statement, in which the prosecutor characterized petitioner's statement to Shaver as "I didn't wa[nt] to do it but she slammed my fingers in the door."  (RT 499-500.)  Trial counsel objected, but the objection was overruled.  In fact, Shaver testified during trial that when he tried to talk to petitioner, petitioner said, "I didn't mean to do anything.  She smash [sic] my finger in the door or something."  (RT 168.)

(Dkt. 14, at 28 of 107.)

As noted by the Superior Court, the prosecutor did not mischaracterize petitioner's statement to Shaver.  Accordingly, this potential claim of alleged prosecutorial misconduct is without merit.

*Prosecution*

Petitioner also appears to argue that the prosecutor committed misconduct by prosecuting him because there was a lack of evidence.  (Dkt. 14, at 78-84.)  Because the evidence against petitioner was strong, petitioner's prosecution did not constitute harassment, as alleged by petitioner.  This claim is without merit.

////

1    *Tapes*

2    Petitioner argues that the prosecutor committed misconduct by having petitioner's

3   wife listen to and then pick out which of his recorded telephone conversations from the jail were

4   played for the jury.  (Dkt. 14, at 84.)  The undersigned does not understand this claim, or how

5   these circumstances allegedly violated petitioner's rights.  Because this claim is vague and

6   unintelligible, it should be denied.

7    *Improper Inferences*

8    Petitioner argues that after he was arrested, the prosecutor came up with

9   "inferences" of improper acts by petitioner against prosecution witnesses Rubit, Mayo and

10  Shaver.  (Dkt. 14, at 86.)  Petitioner argues that use of these "inferences" constituted misconduct.

11  (Id.)

12    Petitioner does not identify any of this allegedly improper evidence.  Because this

13  claim is vague and unintelligible, it should be denied.

14    *Conclusion*

15    After conducting an AEDPA review, the undersigned recommends that

16  petitioner's alleged prosecutorial misconduct claims be denied.

17    C.  Claim 3 – Alleged Ineffective Assistance of Appellate Counsel

18    Petitioner argues that his appellate counsel was ineffective for failing to raise

19  allegedly meritorious claims on appeal.  (Dkt. 14, at 87.)  Petitioner does not cite any particular

20  issues he claims appellate counsel should have raised.  (Id.)

21    A claim of ineffective assistance of appellate counsel uses the same Strickland

22  standard that is applied to trial counsel.  Smith v. Robbins, 528 U.S. 259, 287 (2000).  The

23  failure of appellate counsel to raise meritless or weak issues does not constitute ineffective

24  assistance of counsel.  See Jones v. Barnes, 463 U.S. 745, 751-52 (1983).

25    On appeal, appellate counsel raised one issue: whether the prosecutor committed

26  misconduct when he removed one African-American juror.  (Dkt. 30-1, at 4 of 88.)  Attached to

the amended petition as an exhibit is a letter from appellate counsel to petitioner explaining his

decision to raise this one claim as well as his decision not to raise other claims suggested by

petitioner.  (Dkt. 14-3, at 77-79.)  In relevant part, this letter states as follows.

> Since you have taken the time to write me with possible issues in your case, I want to let you know the following list of issues that I also considered and the reasons why I did not include them in your brief.
>
> 1. False Testimony.
>
> The main issue that you have written me about is the use of false/perjured testimony.  In support of this issue you have pointed out the inconsistencies in the testimony of many of the witnesses at trial.  The reason that I did not raise this issue is that all of these inconsistencies were presented to the jury.  The jury then evaluated which version of the events to believe.  Unfortunately, under our legal system, the jury is charged with evaluating the evidence.  So long as the inconsistencies presented to the jury as was done here, the jury is charged with determining which version is true.  The appellate courts will not re-evaluate those factual determinations.
>
> 2. Pre-trial letter to Court.
>
> Before trial you wrote a letter to the court complaining about inconsistent testimony by the witnesses.  You also complained about the circumstances of your arrest and said that you were questioned without your Miranda rights.  (CT 13.)  I have already discussed the false testimony.  Even if your Miranda rights were violated, no statement from you was introduced at trial so there was no prejudice from improper questioning.
>
> 3. Motion to introduce other acts pursuant to Evidence Code section 1109.
>
> The prosecutor offered other acts evidence pursuant to section 1109 motion in the form of an incident that took place in the year 2000.  (CT 139, 174, 186; RT 17-23.)  The Court weighed the evidence under section 352 and let it in following the correct procedure.  (RT 22-23.)  When the evidence was actually offered, your attorney objected that it would lead to an undue consumption of time and was not relevant.  The court again overruled the objection on both grounds.  (RT 403-407.)  These motions are reviewed for an abuse of discretion by the Court of Appeal.  Since the court clearly considered all of the pros and cons of the evidence and stated his reasoning on the record, there is no abuse of discretion.

4.  Marsden motion on 8/31/01 (CT 2)

You complained that trial counsel was not meeting with you and had not talked to you about the case.  The hearing took place before the preliminary hearing.  The trial court found that there was no basis for removing counsel at that time because a clear conflict had not been established.  This motion was never renewed later in the proceedings.

5.  Review of the instructions (CT 204-218, 223-242.)

In addition to my overall review of the instructions I investigated whether specific intent instruction required for Penal Code section 273.5 charge.  No.  People v. Thurston (1999) 71 Cal.App.4th 1050; People v. Campbell (1999) 76 Cal.App.4th 305.

6.  Sufficient Evidence of Priors (CT 301-328.)

The following documents were introduced to prove your priors.  As you know from my most recent letter, I also reviewed the files for your priors to see if they were valid. The following documents were used to prove your priors.
–Abstract Sacto Case No. 88390/81282 – 9/26/89 – PC 211 of 2/28/89 – PC 664/211 on 11/12/87.  (CT 303, 308, 317, 318.)
– Complaint case No. 88390 (PC 211) filed 1/31/89.  (CT 313.)
– Abstract Case No. 81282. Conviction for PC 664/211 – granted probation (RT 322.)
– Complaint Case no. 81282 filed 10/16/87 PC 664/211 (CT 328) 0.5 hrs.

7.  Motion for a mistrial based on compromise verdict (CT 222)

Your trial counsel moved for a mistrial on the basis that the jury improperly compromised when it reached its inconsistent verdicts.  The law on this issue is fairly clear that the jury is allowed to compromise if it wants to.

Even if we were to view the jury's findings on the sentencing allegations in counts 3, 4, and 5 as inconsistent, however, defendant is not entitled to reversal on this basis.  It is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand.  (Citations omitted.)

***

Nor does the existence of inconsistent verdicts imply that the jury must have been confused.  (Citation.)  An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict (citations).

(People v. Lewis (2001) 25 Cal.4th 610, 656.)

8.  Romero Motion (CT 251.)

The court stated reason for denying the motion.  The standard of review is abuse of discretion.

9.  Pro per motion for a new trial (CT 258-264.)

The grounds stated were mainly perjury by the witnesses.  I have discussed this issue above.  In addition you argued that prosecutor argued facts not in evidence – that you were arrested on a warrant. I reviewed the prosecutor's closing argument carefully and did not find any argument of facts not in evidence.  In addition, whether you were arrested on a warrant was not a material issue and could not have affected the outcome of your case.  (RT 495-514, 544-553.)

You also alleged that one alternate juror said that guilt could be inferred from your custody status.  The issue was raised during voir dire.  The Court admonished the jury as a whole to infer nothing from your custody status.  (ART 31.)  The Court also confronted the juror and she said it was a joke.  She did not believe it.  (ART 34.)  The juror said that she could be fair.  (ART 34.)  When jurors agree to follow instructions the law presumes that they actually do follow them.

You also argue that you received ineffective assistance of counsel because your attorney said, "I'm not defending Byron Johnson, oddly enough.  I'm not.  I'm defending his rights and his right to a fair trial, to proof beyond a reasonable doubt."  (ART 542.)  This argument was a tactical effort to shift the focus from the terrible nature of the injuries to your rights.  It did not work but it was not ineffective assistance.

10.  Motion to exclude the 911 tapes pursuant to Evidence Code section 352.  (RT 35-44.)

The court stated its reasons for denying the motion.  Such tapes are routinely introduced at trials.

(Dkt. 14-3, at 77-79.)

After carefully reviewing the record, the undersigned finds that appellate counsel's decision not to raise the claims suggested by petitioner was not ineffective assistance. As discussed above, appellate counsel's failure to raise meritless or weak issues does not constitute ineffective assistance.

After conducting an AEDPA review, the undersigned recommends that

30

1    petitioner's alleged ineffective assistance of appellate counsel claim be denied.

2                    D.  Claim 4 – Alleged Sentencing Error

3                    *Procedural Default*

4                    Respondent argues that claim 4 is procedurally defaulted because the Sacramento

5    County Superior Court denied this claim by order citing In re Dixon, 41 Cal.2d 756 (1953).

6                    As noted above, federal courts may reach the merits of habeas petitions despite an

7    asserted procedural bar so long as they are clearly not meritorious.  Franklin v. Johnson, 290 F.3d

8    1223, 1232 (9th Cir. 2002), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997).  Because the

9    instant claim is without merit, the undersigned will not reach the procedural bar issue.

10                   *Analysis*

11                   Although difficult to understand, petitioner appears to raise two claims of

12   sentencing error.  (Dkt. 14, at 88-93.)  Petitioner argues that the trial court erred in denying his

13   Romero[17] motion.  Petitioner also appears to argue that because his prior convictions occurred

14   before enactment of the Three Strikes law, use of them to enhance his sentence violates the Ex

15   Post Facto clause.

16                   Under well settled Supreme Court law, the Constitution forbids states to enact any

17   law "which imposes a punishment for an act which was not punishable at the time it was

18   committed[,] or imposes additional punishment to that then prescribed."  Weaver v. Graham, 450

19   U.S. 24, 28 (1981) (quoting Cummings v. Missouri, 4 Wall. 277, 325-26, 18 L.Ed. 356 (1867)).

20   However, the ex post facto prohibition does not preclude states from enacting recidivist statutes

21   which enhance a criminal sentence based on prior criminal convictions if those statutes were in

22   effect when the current triggering offense was committed.  Parke v. Raley, 506 U.S. 20, 27

23   (1992). This ruling is because "a charge under a recidivism statute does not state a separate

24   offense, but goes to punishment only."  Id.

25

26              [17]   People v. Superior Court (Romero), 13 Cal.4th 497, 53 Cal.Rptr.2d 789 (1996).

1    In the instant case, the Three Strikes law was enacted in 1994.  See Dillard v. Roe,

2    244 F.3d 758, 768 n.10 (9th Cir. 2001).  Because petitioner's commitment offense occurred in

3    2001, no Ex Post Facto violation occurred.

4    Under state law, a trial judge has discretion to dismiss a prior "strike" conviction

5    at sentencing.  People v. Garcia, 20 Cal.4th 490, 503-04 (1999); People v. Superior Court

6    (Romero), 13 Cal.4th 497 (1996).  State sentencing courts must be accorded wide latitude in their

7    decisions as to punishment.  See Walker v. Endell, 850 F.2d 470, 476 (9th Cir. 1987).  Generally,

8    therefore, a federal court may not review a state sentence that is within statutory limits.  See id.

9    However, a federal court may vacate a state sentence imposed in violation of due process if a

10   state trial judge imposed a sentence in excess of the state's statutory limits.  Id. There is no

11   dispute that petitioner's sentence in this case was within the statutory limits of California's

12   "Three Strikes" law.  Whether or not the trial court properly exercised its discretion in failing to

13   dismiss one of petitioner's strikes is a question of state law that does not provide a basis for

14   federal habeas relief.

15   Consequently, the state courts' decisions denying petitioner's sentencing claim

16   were not contrary to, or an unreasonable application of, clearly established Supreme Court

17   precedent, nor were they based on an unreasonable determination of the facts in light of the

18   evidence presented.  See 28 U.S.C. § 2254(d)(1),(2).

19   E.  Claim 5 – Removal of African-American Juror

20   Petitioner alleges that the prosecutor improperly removed an African-American

21   juror.  The California Court of Appeal denied this claim for the reasons stated herein:

22   Defendant is African-American. Near the end of jury selection,
     following the prosecutor's peremptory challenge to prospective
23   juror A.G., an African-American, defendant made a motion to
     dismiss the venire panel pursuant to Wheeler, supra, 22 Cal.3d
24   258. At the time of the challenge, there were two other
     African-American men on the panel. Although the court did not
25   state that a prima facie showing of group bias had been made, it
     asked the prosecutor for an explanation of the challenge.

26

The prosecutor said that prospective juror A.G. was a "young man" who, based on his answers on the jury questionnaire, "doesn't have a lot of life experience; that the prosecutor did not get a good feeling from A.G., who is "very quiet"; and that the prosecutor had more information about other jurors, whom he liked better than A.G.

The court "considered what the prosecutor ... said here and [did] not believe that this [peremptory challenge of A.G. was] anything other than the prosecutor having a hunch about this person based on his perception that this person does not have the type of life experience he's looking for in this case that is going to be vigorously contested." The court further stated that it "does not believe, and does not find, that the prosecutor has systematically excluded any cognizable class.... [¶] ... [U]nder the status of this case and the grounds that have been articulated here, the Court is satisfied that this is a legitimate excusal based on what amounts to a hunch about this person's lack of life experience...." Accordingly, the court denied the Wheeler motion.

"[P]eremptory challenges may not be used to remove prospective jurors solely ... because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds ." (People v. Johnson (1989) 47 Cal.3d 1194, 1215.) When a party believes his or her opponent is using peremptory challenges to remove prospective jurors solely on the basis of a presumed group bias, the party must timely object and make a prima facie showing of the same. (Wheeler, supra, 22 Cal.3d at p. 280; see also Batson v. Kentucky (1986) 476 U.S. 79, 96-97 (hereafter Batson).)

"Once a prima facie case has been shown, the burden shifts to the other party to come forward with an explanation that demonstrates a neutral explanation related to the particular case to be tried." (People v. Johnson, supra, 47 Cal.3d at p. 1216, citing Wheeler, supra, 22 Cal.3d at pp. 281-282 and Batson, supra, 476 U.S. at p. 97.) As long as the proffered nondiscriminatory justification is genuine and neutral, it "may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (Wheeler, supra, at p. 275; People v. Arias (1996) 13 Cal.4th 92, 136.) Limited life experience is a valid race-neutral explanation. (People v. Sims (1993) 5 Cal.4th 405, 430.)

"If the trial court makes a 'sincere and reasoned effort' to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. In such circumstances, an appellate court will not reassess good faith by conducting its own comparative juror analysis. Such an approach would undermine the trial court's credibility determinations and would discount '"the variety of [subjective] factors and considerations," "including 'prospective jurors' body language or manner of answering questions,' which legitimately inform a trial lawyer's decision to

exercise peremptory challenges. [Citations.]" (People v. Montiel (1993) 5 Cal.4th 877, 909.) Neither is the trial court obligated to analyze answers of accepted and rejected jurors. (People v. Arias, supra, 13 Cal.4th at p. 136, fn. 16.) Generally, a combination rather than a single factor leads to a challenge; factors include the timing of the challenge, the number of challenges remaining and the prospective jurors remaining in the juror pool. (People v. Johnson, supra, 47 Cal.3d at pp. 1220-1221.)

Here, defendant concedes that "the prosecutor offered two facially race-neutral reasons for excusing [prospective] juror [A.G.], his alleged youth and inexperience." (See People v. Sims, supra, 5 Cal.4th at p. 430 ["the prosecutor's stated justifications were facially race-neutral, based upon a perception of a 'specific' or individual bias of [A.G.] rather than a group bias, and thus afforded a constitutionally permissible basis for the exercise of the peremptory challenges in question"].) Actually, the prosecutor offered additional race-neutral reasons, i.e., he did not get a good feeling from A.G., who was very quiet, and he preferred other prospective jurors who might be substituted for A.G.

Nevertheless, defendant argues the prosecutor's race-neutral explanations were not supported by the record and, instead, were a "mere pretext" to excuse A.G. based upon a "preconceived [racial] stereotype...."

Specifically, defendant takes issue with the claim that A.G. had limited life experience and was quiet. Defendant contends that, if the prosecutor was truly concerned about such limited life experience, he could have asked A.G. more questions. But the fact the prosecutor may have been able to obtain more information from A.G. than was on his jury questionnaire does not mean the questionnaire failed to reveal limitations in the life experiences that the prosecutor wanted for the jury.

In addition, defendant contends there was no evidence that A.G. was quiet. According to defendant, A.G. "was quiet because no one other than the court questioned him [and][j]urors are not expected to interrupt the voir dire of other jurors with their own views." However, the trial court was in the best position to assess whether the prosecutor's impression that A.G. was quiet was based not just on listening to his speech in the courtroom, but upon any number of other observations of A.G., such as his interactions with other jurors, in the courtroom and in the halls, or his body language. (People v. Montiel, supra, 5 Cal.4th at p. 909.)

As was the case in People v. Johnson, supra, 47 Cal.3d 1194, the "trial judge saw and heard the entire voir dire proceedings by which defendant's jury was selected. The record indicates he was aware of his duty under Wheeler [to make a conscientious determination that the prosecutor had not been guilty of group

bias].... He found no improper use of the peremptory challenges by the prosecutor. Under these circumstances we see no good reason to second-guess his factual determination." (Id. at p. 1221.)

After briefing was completed in this case, the United States Supreme Court and the United States Court of Appeals, Ninth Circuit, issued opinions that defendant believes support his contention. We are not persuaded.

Defendant relies on Miller-El v. Cockrell (2003) 537 U.S. 322 (hereafter Miller-El), wherein the Supreme Court stated: "The evidence suggests ... that the manner in which members of the venire were questioned varied by race. To the extent a divergence in responses can be attributed to the racially disparate mode of examination, it is relevant to our inquiry." (Id. at p. __.) Defendant asserts this demonstrates that the "trial court must look beyond the claimed [race-neutral] reason for indicia that the reason(s) may be pretextual."

First, the issue in Miller-El was whether a certificate of appealability should have issued on the petitioner's claim. The standard was whether he had demonstrated that "his petition involve[d] issues which are debatable among jurists of reason." (Miller-El, supra, 537 U.S. at p. ____ .) The court expressly did not determine the merits of petitioner's claim, stating that "[t]he question is the debatability of the underlying constitutional claim, not the resolution of that debate." (Id. at p. __.)

Second, the petitioner in Miller-El presented evidence that 91 percent of eligible African-American jurors were removed by peremptory challenges as compared to just 13 percent of eligible non-African-American jurors. (Miller-El, supra, 537 U.S. at p. ____.)  And 53 percent of the African-American jurors were given "a detailed description of ... an execution," before being asked their views on the death penalty, as compared with only 6 percent of Caucasian jurors. (Id . at p. 947.) On the record, the court believed that "the prosecutors designed their questions to elicit responses that would justify the removal of African-Americans from the venire." (Miller-El at p. __.) It was against this evidentiary backdrop of a purposeful variance by race that the manner of questioning venire members was relevant.

Here, there is no such evidence of a "racially disparate mode of examination." In fact, the questions propounded to A.G. were propounded to every other juror on the venire panel. There is no evidence that A.G. was the only juror peremptorily challenged without further questioning, nor is there any evidence that only African-American jurors were so challenged without further questioning.

Finally, due to the state of the law at the time of the original Batson

1   hearing in Miller-El, "the state trial court had no occasion to judge
    the credibility of [the prosecutors' race-neutral] explanations [of
2   the peremptory challenges.]" (Miller-El, supra, 537 U.S. at p. ___
    .) The Supreme Court confirmed that the trial court's credibility
3   determinations are entitled to "'great deference on appeal' and will
    not be overturned unless clearly erroneous." (Id. at p. ___.)
4
    Here, the trial court expressly considered the credibility of the
5   prosecutor's race-neutral explanations and accepted them. This
    determination is entitled to great deference on appeal; and on the
6   record before us, it was not clearly erroneous.

7   Defendant also relies upon Lewis v. Lewis (9th Cir. 2003) 321
    F.3d 824 (hereafter Lewis), to support his contention that "the trial
8   court must go beyond the mere words of the prosecutor and
    determine whether the reasons are supported by the record." The
9   prosecutor in Lewis offered a number of reasons for the exercise of
    his peremptory challenges. (Id. at pp. 827-828.) The trial court
10  expressly found that "some of the [prosecutor's] arguments [were]
    not convincing[,][b]ut [one] ... [was] probably ... reasonable,"
11  although the court had doubts about that reason, too. (Id. at p. 828.)
    And the court refused to hear defense counsel's argument
12  describing the weaknesses in the record regarding the one
    "probably reasonable" ground found by the court. (Ibid.) The Ninth
13  Circuit held that the trial court had not "fulfilled its affirmative
    duty to determine if the defendant had established purposeful
14  discrimination." (Id. at p. 832.) Specifically, the court's rejection of
    some of the prosecutor's reasons suggested the court "did not find
15  the prosecutor credible." (Id. at p. 834.) Further, the court's
    "abbreviated review of the record produced results that were
16  equivocal at best, and contradictory at worst." (Id. at p. 832.)
    "Concluding that one of many of the prosecutor's reasons, after
17  noting that little or no record support for it exists, is 'probably ...
    reasonable' simply does not fulfill [the court's affirmative duty to
18  determine if purposeful discrimination occurred]." (Ibid.)

19  Here, the trial court did not reject any of the prosecutor's reasons
    for using a peremptory challenge against A.G. Instead, the court
20  believed "the prosecutor [had] a hunch about this person based on
    his perception that this person does not have the type of life
21  experience he's looking for in this case...." And the court did not
    deny defendant the opportunity to fully challenge the prosecutor's
22  reasons based on the record. Defense counsel stated that A.G. had
    not been asked any questions other than those on the jury
23  questionnaire and that he pointed out details of his "life
    experiences" as related by the questionnaire. After giving both
24  sides the opportunity to fully present their arguments, and
    considering those arguments, the court believed the prosecutor and
25  accepted the stated reasons for his exercise of a peremptory
    challenge of A.G.

26

1
2
3
4

> "To fulfill its duty, the court must evaluate the prosecutor's proffered reasons. 'A finding of discriminatory intent turns largely on the court's evaluation of the prosecutor's credibility.' " (Lewis, supra, 321 F.3d at p. 830.) Here, the trial court evaluated the prosecutor's reasons and his credibility. Accordingly, the court fulfilled its duty under Wheeler and Batson.

5

> For all of the reasons stated above, the trial court did not err in denying the Wheeler motion.

6   (Dkt. No. 30-1, at 44-53.)

7        A prosecutor's discriminatory use of peremptory challenges on the basis of race

8   violates the equal protection clause of the United States Constitution.  Miller-El v. Dretke, 545

9   U.S. 231, 237-40 (2005); Batson v. Kentucky, 476 U.S. 79, 89, 69 (1986).  Indeed, "the

10  'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'"

11  Williams v. Runnels, 432 F.3d 1102, 1107 (9th Cir. 2006) (quoting United States v.

12  Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994)).

13       "Batson provides a three-step process for a trial court to use in adjudicating a

14  claim that a peremptory challenge was based on race."  Snyder v. Louisiana, 552 U.S. 472, 476

15  (2008) (internal quotation marks and citations omitted); Batson, 476 U.S. at 96-98.  "'First, a

16  defendant must make a prima facie showing that a peremptory challenge has been exercised on

17  the basis of race[; s]econd, if that showing has been made, the prosecution must offer a

18  race-neutral basis for striking the juror in question[; and t]hird, in light of the parties'

19  submissions, the trial court must determine whether the defendant has shown purposeful

20  discrimination.'"  Miller-El v. Dretke, 545 U.S. at 277 (quoting Miller-El v. Cockrell, 537 U.S.

21  322, 328-29 (2003)).

22       The instant case turns on the third step of the Batson inquiry.  The prosecutor

23  explained that he exercised his peremptory challenge as to juror A.G. for the reasons stated

24  herein:

25
26

> Prosecutor: Well, sort of.  Again, before – I guess – I guess it was premature for me to comment.  The Court asked me to articulate a reason before deciding based on – solely on unrecognizable class.

1   I did inform the Court that in fact the last – I passed three times, I
    believe.  At the present time, I believe there is three African
2   American males, including Mr. Grady on the panel currently,
    (REDACTED) JUROR NUMBER ONE, who was last bumped –
3   or challenged by Mr. Roehr was an African American male.

4   Mr. Roehr: That's not correct.  (REDACTED) JUROR NUMBER
    ONE is still up there.
5
    Prosecutor: Excuse me.
6
    Mr. Roehr: Mr. James.
7
    Prosecutor: I apologize.  Mr. James.  Again, in looking at this
8   challenge, before this motion was brought I looked down at my
    Post-Its that I commonly use.  I noticed that the only information I
9   had about Mr. Grady is that he's a claim adjustor and was a victim
    of a prior 459.
10
    Mr. Grady seems like a young man.  Looking at his – the jury
11  questionnaire, he doesn't have a lot of life experience.  He
    answered no to a lot of questions.  He was never asked individual
12  questions either by myself, the Court or counsel.  We've heard a lot
    more from the other jurors in the box at this moment.
13
    Court: Anything else you wanted to say over it?
14
    Prosecutor: I believe Mr. – excuse me – Mr. Grady is the only
15  remaining juror from the original twelve that were sitting up there,
    other than – Mr. Grady and (REDACTED) JUROR NUMBER
16  THREE and (REDACTED) JUROR NUMBER TWO, I believe
    are the only original three jurors.  I may be wrong on that.
17
    Court: Yes, you're wrong.  There's one original juror and that's
18  number three.

19  Prosecutor: (REDACTED) JUROR NUMBER THREE.  And Mr.
    Grady would be – no, he was brought originally.  You're right.
20  And I would submit it on those comments, your Honor.

21  Court: Mr. Roehr, anything else you wanted to say about it?

22  Mr. Roehr: Yes.  I think the record needs to reflect that Mr. Grady
    is a young African American man.  The defendant in this case is
23  African American.  Mr. Grady – when I say young, I would assume
    that he is perhaps approximately the same age as (REDACTED)
24  JUROR NUMBER THREE who is seated in seat number three.

25  We're told we don't have enough information about Mr. Grady.  In
    fact, we have a questionnaire that tell us he's divorced; that he has
26  roughly a high school education; that he works as a claims

adjustor; that he served in the Air Force, obtaining the rank of E-5, which at least in the Army is sergeant, buck sergeant; that he lives in Carmichael, which is, I think one would agree, a diverse community, not a ghetto, and that he has in the past been the victim of a home burglary.

My concern is that if a challenge is made without – what I can see is some reason for that challenge, then I need to object to it – particularly under these circumstances where he's African American and Mr. Johnson is African American – on Wheeler grounds because there doesn't appear to be an articulable reason for it.  I understand we know more about other jurors or we may, but it may be that Mr. Grady doesn't have relatives in prison, doesn't have relatives in law enforcement and he can't answer questions he hasn't been asked.

Both counsel for the prosecution and I have had numerous opportunity to ask him further questions and I haven't needed to. Apparently counsel for the prosecution either hasn't needed to or has chosen not to.  And I don't think it matters whether the objectionable attempt to excuse someone occurs either when they're the first juror of the fifteenth or the 18th challenge.

I think one can lie in ambush through all 20 jurors and then upon their final challenge try to excuse someone from the same racial group with no articulable reason and it's still objection – that's the basis of my objection.  Counsel is right in saying we do have at least two other men currently on the jury in the box who are African American.

(REDACTED) JUROR NUMBER THREE, in seat three, who is divorced, who has a B.S. degree and works as a computer consultant, has children 16 and 20 years of age, lives in Natomas and privately, I believe, discussed with us he has an ex-wife that worked with Child Protective Services.  We also have (REDACTED) JUROR NUMBER ONE, who appears to be much older, I would say in his –50, 60, single, three years of college, disabled, a printer.  He's the gentleman who suffers from diabetes and needs to stand occasionally.  His spouse is unemployed.  He has two daughters, 17, 24.  We know these things from the document that he filled out. We can't simply ignore that because we didn't take notes off the document and write it down.  He lives in the south area.  He previously sat on a jury with a verdict.  He witnessed robbery and domestic violence instances.

Mr. Grady hasn't had some of those experiences, but there are others who haven't had them either and for the Court to accept a peremptory under these circumstances without articulable reason, I think would be offense to the Constitution and that's why we have the Batson case and the Wheeler case.

1    Court: Anything else?

2    Prosecutor: That is correct.  If I was excusing people based solely
     on their race.  There is very much – very little we know about Mr.
3    Grady.  He's a young man.  (REDACTED) JUROR NUMBER
     THREE, we talked in private.  (REDACTED) JUROR NUMBER
4    ONE tells us he's disabled, he has diabetes.  He asked the Court for
     comfortable chair to sit in.  He wears chaps, he rides a motorcycle.
5    He's very pleasant coming in and out of the courtroom.

6    Mr. Grady, I didn't – I – I did not get a good feeling for Mr. Grady.
     He's very quiet.  There's not a lot we heard from him.  Again, I
7    passed numerous times.  Counsel is right, I could pass all my
     challenges, then start bumping all – a class that is protected by the
8    <u>Wheeler</u> and <u>Batson</u> cases, but in this case it was clearly – we have
     heard very little from him.  We've had more detail from other
9    jurors.  That's why I did it.

10   (RAT, at 257-61.)

11          In rejecting the <u>Batson/Wheeler</u> motion, the trial court stated:

12   Court:  The court has considered the matter.  The standard that the
     court is looking at is one where the prosecution clearly may not
13   systematically exclude any cognizable group.  This is clearly a
     person belonging to a cognizant group when it's the same race and
14   sex as the defendant.

15   On the other hand, the Court is mindful that there is authority that
     allows a prospective juror to be bounced on things as subjective as
16   hunches or counsel's estimation that this person lacks sufficient
     life experience.  And included in those cases is <u>People v. Perez</u>, 29
17   Cal.App.4th 1313, a '94 case.

18   The Court has considered what the prosecutor has said here and
     does not believe that this is anything other than the prosecutor
19   having a hunch about this person based on his perception that this
     person does not have the type of life experience he's looking for in
20   this case that is going to be vigorously contested.

21   Defense Counsel: May I speak?

22   Court: Not till I'm finished.  The Court does not believe, and does
     not find, that the prosecutor has systematically excluded any
23   cognizable class.  The Court is mindful that one is enough; that is,
     the Court's not of the opinion that there has to be a pattern here for
24   the Court to take action on it.

25   But under the status of this case and the grounds that have been
     articulated here, the Court is satisfied that this is a legitimate
26   excusal based on what amounts to a hunch about this person's lack

1    of life experience and accordingly will deny the objection and
     allow the prosecutor to exercise his peremptory challenge.
2

3    (RAT, at 261-62.)

4          The Ninth Circuit has described the analysis required by the trier of fact in

5    evaluating the third <u>Batson</u> factor as stated herein:

6          To determine whether race was a substantial motivating factor-that
           is, whether the defendant has shown "purposeful discrimination" at
7          <u>Batson</u>'s third step - the trier of fact must evaluate "the
           persuasiveness of the justification[s]" offered by the prosecutor.
8          <u>Purkett v. Elem</u>, 514 U.S. 765, 768, 115 S.Ct. 1769 (1995). "In
           deciding if the defendant has carried his burden of persuasion, a
9          court must undertake a sensitive inquiry into such circumstantial
           and direct evidence of intent as may be available." <u>Batson</u>, 476
10         U.S. at 93, 106 S.Ct. 1712 (internal quotation marks and citation
           omitted). This inquiry includes "side-by-side comparisons" of the
11         African American panelists who were struck and white panelists
           who were allowed to serve. "If a prosecutor's proffered reason for
12         striking a black panelist applies just as well to an otherwise-similar
           nonblack who is permitted to serve, that is evidence tending to
13         prove purposeful discrimination to be considered at Batson's third
           step." <u>Miller-El v. Dretke</u>, 545 U.S. 231, 241, 125 S.Ct. 2317
14         (2005).

15   <u>Cook v. LaMarque</u>, 593 F.3d 810, 815 (9th Cir. 2010).

16         In addition, a state court's third step finding of no discriminatory intent

17   "represents a finding of fact of the sort accorded great deference ..."   <u>Hernandez v. New York</u>,

18   500 U.S. 352, 364 (plurality) (1991); <u>Purkett v. Elem</u>, 514 U.S. 765, 769 (1995).  This deference

19   is because "the critical question in determining whether a [defendant] has proved purposeful

20   discrimination at step three is the persuasiveness of the prosecutor's justification for his

21   peremptory strike [,]" which means "the issue comes down to whether the trial court finds the

22   prosecutor's race-neutral explanations to be credible."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322,

23   338-39 (2003); <u>Lewis v. Lewis</u>, 321 F.3d 824, 830 (2003).  "To secure habeas relief, [a]

24   petitioner must demonstrate that a state court's finding of the absence of purposeful

25   discrimination was incorrect by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and that

26   the corresponding factual determination was 'objectively unreasonable' in light of the record

1   before the court." Miller-El, 537 U.S. at 348.

2        The prosecutor's primary reason for rejecting juror A.G. was his lack of life

3   experience, as demonstrated by his young age, his quiet courtroom demeanor, and what little the

4   prosecutor said he knew about him.  Inexperience (and youthfulness) are acceptable race-neutral

5   explanations for the exercise of peremptory challenges. Sims v. Brown, 425 F.3d 560, 574 (9th

6   Cir. 2005).

7        After carefully reviewing the record, the undersigned finds that the decision by the

8   by the California Court of Appeal upholding the trial court's finding that the prosecutor had not

9   engaged in discrimination when he dismissed juror A.G. was not objectively unreasonable.

10  While the trial court did not directly engage in a "comparative analysis" during the

11  Batson/Wheeler hearing, petitioner's trial counsel argued that A.G.'s life experience was similar

12  to that of jurors one and three who were also left from the original panel.  The trial court properly

13  found that these comparisons did not support a finding of discrimination.

14       First of all, it was apparently undisputed that juror A.G. was young.  Petitioner's

15  trial counsel claimed that juror A.G. and juror number three were close in age.  However, this is

16  difficult to believe because juror number three had children 16 and 20 years old.

17       The prosecutor also adequately explained his concern regarding A.G.'s quiet

18  demeanor, in comparison to that of jurors number three and one. The prosecutor stated that juror

19  number three had talked to the trial court and the lawyers in private and juror number one was

20  "pleasant coming in and out of the courtroom" and had asked for a different chair to

21  accommodate his disability.  In contrast, juror A.G. was very quiet.  In finding no discrimination,

22  the trial judge found that the prosecutor's assessment of the demeanor of these jurors was not

23  inaccurate.  The trial judge's findings regarding the demeanor of individuals in the courtroom

24  must be deferred to. Hernandez, 500 U.S. at 365 ("As with the state of mind of a juror,

25  evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly

26  within the trial judge's province.'") (citations omitted).

1        Regarding juror A.G.'s lack of experience, petitioner's trial counsel argued that

2    juror A.G.'s life experience, as set forth in his questionnaire, was similar to juror number three's

3    experience.  The life experiences of A.G. and juror number three were sufficiently different to

4    support the trial court's finding that the prosecutor did not engage in discrimination.  Juror A.G.

5    had a high school education, whereas juror number three had a B.S degree.  Juror A.G. had no

6    children, whereas juror number three had two children.  The prosecutor's failure to challenge

7    juror number three was not evidence of discrimination regarding juror A.G.

8        Petitioner's counsel also discussed the life experience of juror number one.

9    However, juror number one was apparently significantly older than juror A.G. and had three

10   years of college and two children ages 17 and 24.  The prosecutor's failure to challenge juror

11   number one was not evidence of discrimination regarding juror A.G.

12       The fact that the prosecutor did not strike two other African-American jurors on

13   the panel further undermines any purported showing of purposeful discrimination.  See

14   Cooperwood v. Cambra, 245 F.3d 1042, 1048 (9th Cir. 2001) (no prima facie Batson violation

15   where ultimate composition of jury included two African-Americans, three Asians, and one

16   Pacific Islander).  Indeed, the Ninth Circuit applies this rule even on the much less stringent

17   standard of direct review.  See United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994)

18   (courts may consider impact of prosecutor's challenge on jury's ultimate composition in

19   determining whether prosecutor violated Batson).

20       A careful review of the record supports the trial court's finding that the prosecutor

21   was concerned about juror A.G.'s lack of experience.  After conducting an AEDPA review, the

22   undersigned recommends that this claim be denied.

23   V.  Conclusion

24       In the traverse (Dkt. No. 34), petitioner raises several claims of ineffective

25   assistance of counsel and ineffective assistance of appellate counsel not raised in the amended

26   petition.  These new claims are disregarded.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507

1   (9th Cir. 1994) (a traverse is not the proper pleading to raise additional grounds for relief);

2   Greenwood v. Fed. Aviation Admin., 28 F.3d 971, 977 (9th Cir. 1994) ("we review only issues

3   which are argued specifically and distinctly in a party's opening brief").

4          For all of the above reasons, the undersigned recommends that petitioner's

5   application for a writ of habeas corpus be denied.  If petitioner files objections, he shall also

6   address whether a certificate of appealability should issue and, if so, why and as to which issues.

7   A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a

8   substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

9          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

10  a writ of habeas corpus be denied.

11         These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

13  days after being served with these findings and recommendations, any party may file written

14  objections with the court and serve a copy on all parties.  Such a document should be captioned

15  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

16  objections shall be filed and served within fourteen days after service of the objections.  The

17  parties are advised that failure to file objections within the specified time may waive the right to

18  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19  DATED:  December 13, 2010

20

21                                            _____

22                                            KENDALL J. NEWMAN
                                              UNITED STATES MAGISTRATE JUDGE

23  john253.157

24

25

26